IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NO.: 06-CA - 4323

FLORIDA DIGITAL NETWORK, INC.,

        Plaintiff,

vs.

NORTHERN TELECOM, INC., N/k/a NORTEL
NETWORKS, INC

        Defendant.

## COMPLAINT WITH JURY TRIAL DEMAND

COMES NOW the Plaintiff, FLORIDA DIGITAL NETWORK, INC. ("FDN"), and

hereby sues the Defendant, NORTHERN TELECOM, INC., n/k/a NORTEL NETWORKS, INC.

("Nortel"), and for a cause of action would state as follows:

## INTRODUCTION

1.      By this action, FDN seeks declaratory judgment and damages in order to prevent

Nortel's threatened and unauthorized back-billing of FDN, of an amount exceeding $3.9 million,

for basic DMS (Digital Multiplex System) telecommunication switch software functionality that

FDN had been licensed by Nortel to use for the life of the Products FDN had purchased from

Nortel[1]. Over the course of the more than seven (7) years these parties have had a contractual

relationship, FDN has been invoiced and paid Nortel more than $40.5 million for capitalized

expenditures for hardware, software, and switch installation during the 1998-2006 contract

---

[1] $500-600,000 of such amount was allegedly for succession product transfer fees, which FDN denies are due and
owing.

1

period[2]. These amounts were paid for "Products" and "Services" as those terms are defined in Section 1.20 and Section 1.23 of the Master Purchase Agreement (**Exhibit "A"**) dated November 20, 1998 (the "Purchase Agreement"). <u>The "software license that was expressly and/or impliedly granted by Nortel to FDN was, "with respect to Licensed Software furnished in connection with Hardware, for the life of the Hardware as it may be repaired or modified". See Purchase Agreement Section 10.2.</u>

2.      In September 2002, in a <u>Settlement Agreement and Mutual Release</u> between Nortel and FDN that was intended to "true-up" all trade account payables in connection with products and services provided by Nortel, no mention whatsoever was made by Nortel of "software reconciliation" and/or "right to use license fees[3]" ("RTU's") when FDN paid Nortel $1,220,910.96.   The periodic billing through invoices generated by Nortel between did not include any portion of the complained of $3.9 million amount, early January 2006 being the first time Nortel mentioned this purported "obligation" to FDN.

3.      Nortel's contention that an additional $3.9 million was owed, which purported to be based on "software reconciliation and/or RTU fees" going back more than seven (7) years, was made by Nortel Product sales representatives in order to leverage Nortel's position in the context of new and/or upgraded product and service sale negotiations being conducted with FDN. From the inception of the Purchase Agreement, Nortel had full remote access to all of the Nortel switches utilized by FDN, which permitted Nortel to inquire and determine remotely the full degree of software utilization by FDN.  Despite the fact that Nortel did in fact utilize such

---

[2] This amount does include taxes and shipping expense, but it does not include maintenance or other periodic fees, so the total paid amount is higher.

[3] In the telecommunication industry, RTU fees are monies paid to a switch vendor for the license to use the software required to operate an maintain a modern digital switch.  The RTU fee charged when a switch is first installed customarily covers all of the features and functionality that exist at the time the switch is installed, regardless of usage level.

remote access on multiple occasions throughout the contractual relationship, Nortel intentionally or negligently concealed the results from FDN until year 2006.

4.      The March 15, 2006 "FDN Communications Network Evolution Proposal" that first set forth in writing this $3.9 million purported "software reconciliation and/or RTU fees" is attached as **Exhibit "B"**. Included within **Exhibit "B"** is a "Pricing Summary", also delivered by Nortel to FDN at this same time, which purports to support Nortel's claimed "software reconciliation and/or RTU fees." This "Pricing Summary" is not an invoice or bill. Nortel is only authorized, pursuant to Section 4.1 of the Purchase Agreement, to charge FDN for "Products" or "Services" *as mutually agreed in writing*. FDN never agreed in writing that FDN could be charged for the "software reconciliation and/or RTU fees" that make up the $3.9 million "obligation."

5.      To date, Nortel has never reduced this $3.9 million "obligation" to an actual invoice or bill, nor has Nortel ever formally made demand on FDN for payment thereof. FDN cannot be in default of a purported obligation which Nortel has never even invoiced FDN for payment of. Notwithstanding the foregoing, (i) Nortel's illegitimate tying of the $3.9 million "obligation" to Nortel's new and/or upgraded product negotiations with FDN, coupled with (ii) the suspension of performance and control capability that Nortel has over FDN's switch functionality (which could, if exercised by Nortel, result in a devastating disruption of service for FDN's business); and (iii) Nortel's "copyright misuse" and recently discovery pattern of deceptive and unfair trade practices, have combined to compel FDN to seek a judicial declaration of the parties' rights and obligation under the Master Purchase Agreement and governing law. FDN is the beneficiary of both the express license conferred by the Purchase Agreement, as well

as an implied license created by the conduct of the parties, to utilize Nortel's software without further payment.

6.     The Purchase Agreement in place since 1998 provides, in Section 10.2, that FDN has already paid for and been granted, with respect to Licensed Software furnished in connection with Hardware, a right to use that Nortel already agreed shall last "for the life of that Hardware as it may be repaired and modified." Nortel cannot unilaterally change its contract with FDN, notwithstanding what Nortel's policies/contracts with others might be[4].   To the extent any specific feature included within the $3.9 million "obligation" is subject to usage limitations, Nortel has known since 1998 that such limitations were exceeded within the first month each Nortel switch was in operation at FDN.  FDN relied upon the Nortel's course of dealing, over a period of more than seven (7) years, during which Nortel did not charge FDN any usage-based "software reconciliation and/or RTU fees". That course of dealing has created an implied license that exists independent of software usage levels for any Nortel features to which usage levels do apply under the Purchase Agreement, and/or the Purchase Agreement was amended by the course of dealing and conduct of the parties to eliminate such usage level requirements (if any are applicable to the $3.9 million "obligation", which FDN denies).

7.     Nortel has refused to withdraw its extortionate $3.9 million ransom demand from the new and/or upgraded product sale negotiations despite the fact that FDN has made it clear to Nortel that FDN denies such amounts are owed.   On its own, FDN recently uncovered a "Product Bulletin" on Nortel's website, www.nortel.com, entitled "*Policy for software Right-to-Use licensing for Nortel Networks North American DMS and VoIP product Porfolios*" (the "Later Nortel Software RTU Policy"), a copy of which is attached hereto as **Exhibit "C"**. The

4

Later Nortel RTU Software Policy was never given by Nortel to FDN, and came into existence at an indeterminate point long after the Purchase Agreement was entered into between Nortel and FDN. The Later Nortel Software RTU Policy recites Nortel's intention to leverage its software license structure by charging fees associated with "the customer's authorized usage level in the software", and using its monitoring and control capability deployed within the switches Nortel previously sold to enforce payment thereof. This belated Nortel Policy cannot circumvent FDN's rights under the Purchase Agreement. The very existence of the Later Nortel Software RTU Policy, coupled with Nortel's illegitimate tying of the $3.9 million in RTU fees and/or software reconciliation "obligation" to Nortel product sale negotiations, gives FDN reason to believe that Nortel's illegitimate demands will continue unless FDN satisfies Nortel's new and/or upgraded product purchase expectation. The Later Nortel Software RTU Policy also alludes to Nortel's pattern and practice of accusing those who don't accede to Nortel's demands of violating Nortel's intellectual property rights, an accusation that is unfounded because FDN has both an express and implied license entitling FDN to use all of Nortel's software features comprising the $3.9 million demand.

8.     With regard to accusations of violation of Nortel's intellectual property rights (which Nortel has not yet made *vis-à-vis* FDN, but which FDN has recently discovered that Nortel has a pattern and practice of making), governing law is clear that a non-exclusive license to utilize copyrighted software can be granted in writing (such as in the Purchase Agreement), can be granted orally, or can be implied from the conduct of the parties. Korman v. HBC Florida, 182 F.3d 1291 (11th Cir. 1999). Payment is not a condition precedent to implying a license. Effects Associates v. Cohen, 908 F.2d 555 (9th Cir. 1990). A copyright owner cannot

---

4 Section 10.2 of the FDN/Nortel Purchase Agreement differs from specimen Nortel Contracts available on the Internet, which specimens limit the software license granted by Nortel "to the extent of activation or authorized

claim a copyright infringement or misappropriation of trade secrets (accusations Nortel has leveled against others, but not yet FDN) for activities that it has licensed, expressly or by implication. Applied Information v. Icart, 976 F.Supp 149 (E.D.N.Y. 1997). FDN further affirmatively states that Nortel's software licensing agreement, which purportedly restricts the software usage to Nortel's supplied hardware, is unenforceable under the copyright misuse doctrine.    Lasercomb v. Reynolds, 911 F.2d 970 (4th Cir. 1990); Alcatel USA v. DGI Technologies, 166 F.3d 772 (5th Cir. 1999)(court found misuse where the holder of a software copyright licensed the software on the condition that the licensee only use the software in conjunction with hardware manufactured by the copyright holder). The question in a copyright misuse case is whether the copyright is being used in a manner violative of public policy, and Nortel's actions *vis-à-vis* FDN do violate public policy. Nortel's flagrant disregard of FDN's express and/or implied software license rights, coupled with Nortel's tying of an illegitimate demand to new and/or upgraded product purchases, should be declared by this Court to be violative of public policy, a breach of the Purchase Agreement, fraud, and a deceptive and unfair trade practice.

9.    FDN brings this declaratory judgment and damages action before FDN has been invoiced by Nortel because Nortel's continued insertion of the $3.9 million "software reconciliation and/or RTU fees" purported "obligation" into new and/or upgraded product sale negotiations has, and will continue, to damage FDN by raising a cloud over FDN's product purchasing decisions. Resolution of this controversy is necessary to avert further harm to FDN from this deceptive and unfair trade practice by Nortel, particularly if Nortel were to accuse FDN of violating Nortel's intellectual property rights and/or threaten FDN with disruption of service or otherwise exercise rights that Nortel claims to have under the Purchase Agreement. If Nortel

---

usage level." FDN/Nortel Section 10.2 doesn't provide this.

violates FDN's rights under the Purchase Agreement, or otherwise suspends Nortel's own performance under the Purchase Agreement by wrongfully claiming that FDN is in default thereunder, then FDN will suffer irreparable harm. Such action by Nortel would also be in flagrant disregard of the software license, express and/or implied, that FDN acquired from Nortel by paying over $40.5 million.

## THE PARTIES, JURISDICTION AND VENUE

10. FDN is a Delaware corporation with its principal operations and place of business in Maitland, Florida. FDN provides business and residential telecommunication services to its approximate 70,000 customers and has been conducting business in Florida since 1998.

11. Nortel is a Delaware corporation which is authorized to transact business in Florida, and has a registered agent in Florida. Nortel maintains a regional headquarters within the State of Florida, and also maintains sales centers in Florida. Nortel conducts business throughout the Central Florida area, including Orange County, and Nortel entered into the Master Purchase Agreement (the "Purchase Agreement") that is the subject of this lawsuit with FDN in Orange County, Florida. Nortel is engaged in the manufacture and sale of telecommunications products and offers services associated with such products throughout the State of Florida, including in Orange County, Florida.

12. This Court has subject matter jurisdiction and personal jurisdiction over the parties. Venue is proper in this Court because, *inter alia*: (i) FDN is a resident of Orange County, Florida; (ii) Nortel, a foreign corporation doing business in Florida, regularly transacts business in Orange County and has agents or representatives in Orange County; (iii) the causes of action being brought by FDN against Nortel accrued in Orange County, Orange County being where the Purchase Agreement was entered into; (iv) the property of FDN in litigation, including

but not limited to a large portion of the hardware FDN purchase from Nortel, is located in Orange County; and (v) significant events giving rise to this action occurred in Orange County.

## GENERAL FACTUAL ALLEGATIONS

13.     Nortel is a telecommunications equipment manufacturer giant headquartered in Toronto, Canada, and now employs over 31,000 people. Nortel's market capitalization fell from C$398 billion in September 2000 to less than C$5 billion in August 2002, and Nortel's stock plunged from C$125 to C$0.69 during that same time frame. This precipitated a wave of financial and accounting scandals at Nortel, and required restatements of earnings for several years. In addition to spawning civil and criminal investigations, shareholder class action lawsuits against Nortel were brought. Nortel agreed to settle these class actions in 2005 for $2.5 billion. Nortel has a demonstrated pattern and practice of deception in its business practices.

14.     Nortel has more recently been associated with injunctive proceedings, brought by the State of Florida Attorney General, to enjoin deceptive and unfair trade practices concerning leases that had been entered into by NorVergence, and assigned to others. These leases were for bundled communication services that were aggressively marketed to small businesses using high-pressure sales tactics (NorVergence represented to consumers that it was affiliated with Nortel, public records report). The Florida Attorney General sought injunctive relief precluding enforcement of numerous leasing agreements on the grounds of both unconscionablity and deceptiveness.

15.     In 1998, when FDN first began its operations, Nortel was a dominant provider of fiber-optic equipment, networking solutions and services for wireline technologies. FDN sent out a Request for Proposal (RFP) for a Network Switch Platform, and Nortel responded by promoting Nortel's "state of the art DMS-500 switching system." Nowhere in that Nortel

response to RFP was it stated or even alluded to that, seven (7) years into the contractual relationship that followed, Nortel would seek to impose $3.9 million in back-billing for DMS switch software functionality and RTU fees that FDN had been licensed to use (either expressly or by implication) for the life of the Products FDN had purchased from Nortel. The Nortel response to RFP profiled a pricing schedule for FB (flat business line) and FR (flat residential line) functionality, no RTU fees or "software reconciliation" was contemplated for basic caller functionality on a usage level or "per line" basis.

A.     The Master Purchase Agreement.

16.     On or about November 20, 1998, FDN and Nortel entered into a Purchase Agreement pursuant to which FDN purchased multiple DMS-500 switches from Nortel at the cost of more than $2.0 million each. The switches were part of the "Initial System" defined in Section 1.12 of the Purchase Agreement to "mean Hardware and Software." Section 4.3 of the Purchase Agreement further states that "*Nortel shall invoice Company* [FDN] *for Products* [defined in Section 1.20 as the Hardware, Software and Documentation] *and Services* [as defined in Section 1.23 of the Purchase Agreement]", invoices to be paid within thirty (30) days and Nortel being permitted to recover collection costs and legal fees as a result of late-payment or non-payment by FDN. Only "Products" or "Services" that FDN orders (see Section 1.19) can be the subject of a charge to FDN by Nortel (see Section 4.1), unless otherwise agreed in writing. FDN denies that the Purchase Agreement entitles Nortel to charge software license fees based on usage levels, seven (7) years after the fact.

17.     FDN has paid Nortel more than $40.5 million since 1998 pursuant to the Purchase Agreement, over a seven (7) year course of dealing. FDN has paid, or compromised and then paid, all charges reflected in invoices that were rendered to FDN by Nortel. Nortel has never

charged FDN for the $3.9 million in "software reconciliation and/or RTU fees" which are the subject of this lawsuit, so FDN cannot be in default under the Purchase Agreement.

18.     Over the more than seven (7) years during which the Purchase Agreement has been in effect, Nortel has audited FDN's DMS switches at least 6-7 times, in the course of normal product maintenance and upgrades.  Consistent with these periodic audits, FDN has been invoiced for, and paid Nortel for, additional Nortel product upgrades and services.  At no time in the past seven (7) years has FDN ever invoiced for "software reconciliation and/or RTU fees" for the basic call functionality that now forms of the basis of Nortel's illegitimate $3.9 million demand.  This functionality was included in the price of the DMS switches for the life of that hardware which FDN paid for.  To the extent any specific feature was on a per line utilization basis, the course of dealing between the parties conferred a fully paid up right-to-use upon FDN.  The addition of ports to the Nortel switches is also within the scope of the license conferred by Section 10.2 of the Purchase Agreement.

19.     In September 2002, pursuant to a <u>Settlement Agreement and Mutual Release</u> that was entered into between FDN and Nortel, FDN satisfied all then-existing obligations to Nortel in exchange for payment of $1,220,910.96.  At no time was Nortel's purported "software reconciliation and/or RTU fees" included as a purported obligation that FDN owed Nortel, not in connection with Settlement Agreement or at other periodic times when FDN requested that Nortel provide FDN with an accounting of the full amount that FDN owed.

20.     At the time the Purchase Agreement was entered into, FDN had just commenced its business operations, and FDN had a limited number of business and residential lines in use.  <u>FDN surpassed Nortel's claimed per line utilization limitations on the features which Nortel claimed them during the first month of switch operation.</u>  As a result of steady growth in FDN's

business operations over the past seven (7) years, FDN now has approximately 250,000 lines in use. FDN's incremental addition of line utilization over the past seven (7) years is well known to Nortel because Nortel not only has the capability to remotely audit FDN's Nortel switches, but has performed such remote audits at FDN at least 6-7 times during that time frame. Through periodic contact by Nortel with FDN's business representatives over the past seven (7) years, Nortel has also obtained actual knowledge of FDN's growth.

21.     Since 1998, FDN has priced and bundled its telecommunications services for both business and residential customers in reliance upon the provisions in the Purchase Agreement, including but not limited to Section 10.2 thereof. Section 10.2 provided that FDN had already paid for a right and license to use the Licensed Software furnished to FDN by Nortel, for the life of that Hardware as it may be repaired or modified. Based on the periodic auditing and invoicing by Nortel that occurred over the past seven (7) years, FDN further relied upon Nortel's representations and course of dealing that no usage level based RTU's were due and owing for the software associated with FDN's residential and business line functionality which now makes of Nortel's purported $3.9 million "software reconciliation and/or RTU fees obligation."

B.     **Nortel's Improper Billing and Sales Solicitation Practices.**

22.     In January 2006, Nortel raised for the first time with FDN the prospect that FDN purportedly owed Nortel a substantial sum for "software reconciliation and/or RTU fees" for additional line utilization that Nortel determined FDN had added since 1998, the Purchase Agreement inception date. This extortionate back-billing demand was first made by Nortel sales representatives who also admitted to FDN that they had no authority to invoice FDN for these amounts. Instead, these Nortel sales representatives requested that FDN issue a Purchase Order

("PO") for the level of FDN's additional line utilization so that Nortel could then issue FDN an invoice for the same.

23.     FDN advised Nortel that FDN had never contemplated it would be charged RTU fees for such residential line and business line functionality software because the Purchase Agreement provided this was part of the "Product" that FDN had purchased when it paid more than $2.0 million for each of the Nortel's DMS-500 switches. The Purchase Agreement provides in Section 10.2 that the *duration of FDN's license to utilize Licensed Software is, with respect to Licensed Software furnished in connection with Hardware, for the life of that Hardware as it may be repaired of modified*. The basic residential and business line functionality which Nortel has threatened to engage in extortionate back-billing of FDN for was furnished in connection with the Hardware, and therefore was previously paid for by FDN. To the extent the Purchase Agreement provides otherwise with respect to any particular line-item of Nortel's threatened back-billing, then Nortel either amended the Purchase Agreement through course of dealing to waive entitlement to such "software reconciliation and/or RTU fees", has waived and/or is estopped, and/or is barred by the doctrine of laches – based on delays in enforcing claimed rights - from charging FDN therefore based on incremental additional line usage that has taken place over the course of the seven (7) years. Nortel's inaction for seven (7) years, despite Nortel's actual knowledge of FDN's growing usage levels due to the remote audits Nortel performed, constitutes a ratification of FDN's express or implied software license.

24.     With respect to DMS 500 switches purchased by FDN from Mpower Communications, FDN also acquired the same rights to basic residential and business line software functionality. Payment (to the extent any is required) to Nortel for software utilization has been made by FDN such that additional amounts are not due and owing based on incremental

0061014/122260/954424/1

additional line usage that has taken place since the secondary market purchase thereof. FDN owes Nortel no "software reconciliation and/or RTU fees" for secondary market purchases.

25.     FDN has and does object to Nortel's threatened back-billing demand as an extortionate strong-arm tactic Nortel is utilizing to compel additional and/or upgraded product and services purchases from Nortel by FDN. Nortel made the linkage clear because Nortel sale representatives have repeatedly stated, since January 2006, that the back-billing would not materialize if FDN purchased a corresponding amount of Nortel new and/or upgraded product and services. In short, Nortel is requiring that FDN spend $3.9 million on new and/or upgraded product and services with Nortel in order for the corresponding $3.9 million in back-billing for "software reconciliation and/or RTU fees" which Nortel is contending is owed to "disappear without invoicing." Nortel's conduct and lack of invoicing is consistent with no actual debt of $3.9 million being owed by FDN to Nortel.

26.     Attached hereto as **Exhibit "B"** is a true and correct copy of the sales presentation for additional and/or upgraded product purchases given to FDN by Nortel sales representatives on or about March 15, 2006, this being where the extortionate back billing "obligation" $3.9 million first appeared in writing. Nortel first mentioned this "obligation" to FDN representatives in January 2006. At no time since either of these date has Nortel ever provided an invoice to FDN for this amount. Instead, Nortel sales representatives have repeatedly held the $3.9 million back billing "obligation" over FDN's head in order to compel capital expenditures by FDN on additional and/or upgraded Nortel products and services. Nortel sales representatives have been careful to disavow the conclusiveness of their calculations, thereby giving Nortel the ability to unilaterally increase the amount, or abandon it entirely. FDN contends the $3.9 million "obligation" is for incremental additional residential line and business line functionality, added

over the past seven (7) years as a consequence of the growth of FDN's business, which Nortel is not entitled to separately charge FDN for under the Purchase Agreement, and/or which Nortel has waived or is estopped from billing FDN for due to the express and/or implied license Nortel conferred upon FDN.

27.     Significantly, all of the user functionality which Nortel sales representatives were now claiming entitlement to payment of "software reconciliation and/or RTU fees" for was already a part of FDN residential and business line basic switch functionality; it did not have to be added or "turned on" by Nortel (rather, it was always "on").  While FDN recognized that certain software upgrades which added functionality to its DMS-500 switches could under certain circumstances be separately invoiced, basic residential and business line functionality was not part of this.  FDN has paid Nortel for any/all software upgrades and/or additional functionality that was required.

28.     The Purchase Agreement states on its face, in Article 12.5 thereof, that enforcement of any right under the Purchase Agreement must be commenced within two (2) years after the cause of action accrues, or it shall be deemed waived and barred.  Such a two (2) year look back is standard in the telecommunications industry.   Nortel knew that FDN relied upon that industry practice, Article 12.5 of the Agreement, Nortel's remote auditing of the FDN switches, the periodic invoicing by Nortel, and the specific instances when Nortel stated what FDN's obligations to Nortel were (including but not limited to the September 2002 Settlement Agreement described above), to budget for FDN's aggregate level of indebtedness to Nortel. FDN denies any liability for any portion of the threatened back-billed amount of $3.9 million to Nortel, but FDN has also stated to Nortel that such amount would be less than $2.0 million if Nortel's claim was limited to only the past two (2) years.  Nortel sales representatives have

illegitimately claimed that the two (2) year look back is "not applicable" to "software reconciliation and/or RTU fees", even though Nortel has never even furnished an invoice to FDN for the same.

29.    Over the entire course of FDN's seven (7) year contractual relationship with Nortel, FDN has, from time to time, requested that Nortel represent to FDN what amounts were owed for budgeting, accounting, and other business planning or transactional purposes.  At no time during the past seven (7) years did Nortel ever disclose that "software reconciliation and/or RTU fees" were due and owing despite the parties course of dealing and contract requirements that amounts due to Nortel be disclosed/charged to FDN.  By not including the $3.9 million "obligation" in the periodic "statements of account" that Nortel provided to FDN, Nortel represented to FDN that the $3.9 million "obligation" was in fact not owed, and FDN relied upon the foregoing.

30.    FDN contends the Purchase Agreement does not permit Nortel to charge FDN for any portion of the $3.9 million in threatened back-billing now being claimed by Nortel sales representatives, despite the fact Nortel never issued to FDN an invoice for such amount.  To the extent this Court or the Jury determine the Purchase Agreement provides otherwise, FDN alternatively contends that the Purchase Agreement was modified by course of dealing between the parties and/or the granting of an implied license, to eliminate Nortel's entitlement to "software reconciliation and/or RTU fees".   Nortel has further waived or is estopped from belatedly claiming entitlement to the same over this seven (7) year contract period. The periodic billing that Nortel and FDN engaged in is cited in support of the foregoing, as is the fact that no invoice was ever provided by Nortel to FDN for this "obligation."   An "account stated" is an agreement between parties that the balance struck for items of account representing such

transactions, fixing the amount due, is enforceable as to the agreed balance. Nortel's account stated did not include any portion or all of the $3.9 million obligation, and FDN relied upon that.

31.    FDN further relies upon the absence of any invoicing or billing by Nortel for this "obligation", the periodic audits of FDN's switches by Nortel which did not result in any billing for "software reconciliation and/or RTU fees", and the fact that FDN knew that Nortel was aware of FDN line utilization from the 1998 inception of the Purchase Agreement until early 2006 when the extortionate back-billing threat was first made by Nortel. From the very first time Nortel made its $3.9 million extortionate back billing demand, FDN has objected to the same as being unauthorized under the Purchase Agreement. Although FDN continued to engage in potential product and service acquisition discussions, FDN has rejected Nortel's attempts to link such product purchases to the extortionate back billed amount Nortel contended were due. FDN had no choice but to respond to Nortel's demands by objecting to linkage and then stating that Nortel would have to release this purported $3.9 million "obligation" as a condition to Nortel product purchases or upgrades.

32.    To date, the aggregate amount of unresolved and disputed extortionate back billed amount is $3.9 million. There may be additional, similar disputes based on FDN residential and business line utilization because Nortel has renounced any intention to withdraw the extortionate back billed amount from ongoing FDN/Nortel additional product sale negotiation. FDN includes in this lawsuit any additional, similar disputes raised by Nortel concerning software licensure and right to use, that is premised on usage levels, irrespective of whether Nortel has rendered an invoice therefore, without waiver of FDN's contention that FDN is not in default under the Purchase Agreement and expressly reserves all rights and remedies thereunder.

0061014/122260/954424/1

33.     FDN has paid any and all required software license fees, including any RTU fees based on usage levels, software reconciliation, and/or secondary market purchases, by virtue of the more than $40.5 million FDN has paid Nortel since 1998.  To the extent payment was not made for a particular software feature, or usage level (if applicable, which FDN denies), payment was not required based on course of dealing and FDN's express and/or implied license.

34.     All conditions precedent to the bringing of this action have occurred or have been waived.

35.     Section 4.5 of the Purchase Agreement contains a recovery of attorney's fee and cost provision, for legal action commenced by Nortel to enforce the Purchase Agreement, which under Florida Statute § 57.105(7) is deemed to reciprocally run in favor of FDN should FDN be found to be the prevailing party in FDN's action to enforce the Purchase Agreement.  FDN has employed the undersigned attorneys at Lowndes Drosdick Doster Kantor & Reed, P.A. as its counsel, and have agreed to pay said counsel a reasonable fee for their services which FDN expressly seeks to have taxed against Nortel herein.

## COUNT I - DECLARATORY JUDGMENT

36.     FDN realleages and incorporates by reference the allegations set forth in paragraphs 1 through 35 above.

37.     This is a cause of action for declaratory relief brought by FDN against Nortel pursuant to Chapter 86 of the Florida Statutes.  It is in addition to the relief requested in the remaining counts, and consistent with Florida Statutes § 86.111, FDN prays for full and complete equitable relief and prays for a speedy hearing of this declaratory relief action.

38.     The Purchase Agreement, together with applicable and governing law, governs the rights and obligations of FDN and Nortel with respect to the provision of telecommunication services by Nortel, and the resolution of disputes concerning amounts owed between the parties.

0061014/122260/954424/1

FDN has an express and/or implied license, by virtue of the Purchase Agreement as well as the course of dealing between the parties, to utilize Nortel's software without paying any portion, much less all, of the $3.9 million "software reconciliation and/or RTU fees" threatened, but never invoiced, by Nortel.

39.     There is a bona fide, actual, present and practical need for a declaration of the rights and obligations of the parties concerning their direct and substantial rights and obligations under the Purchase Agreement.   All parties will be substantially affected by the Court's determination as to the rights and obligations of the parties under the Purchase Agreement as well as governing law, including but not limited to the express and/or implied license conferred upon FDN by virtue of the course of dealing between the parties more particularly described therein.  FDN has no adequate remedy at law, save by declaratory judgment declaring the rights and obligations of FDN with respect to the Purchase Agreement, and other governing law.

40.     The Purchase Agreement expressly provides that no amount is "due and payable" by FDN to Nortel unless Nortel has provided FDN with an invoice therefore.  The Purchase Agreement further limits Nortel to pursuing rights that accrued only within the past two (2) years.  Section 10.2 of the Purchase Agreement conferred upon FDN a right and license to use the Hardware  with respect to which the Licensed Software was furnished, for the life of that Hardware as it may be repaired or modified. In total disregard of the foregoing, Nortel sales representatives have threatened FDN with extortionate back-billing for a purported $3.9 million "obligation" allegedly consisting of "software reconciliation and/or RTU fees" that are not due. Nortel has never invoiced FDN for such amounts over the course of the seven (7) years the Purchase Agreement has been in effect between the parties. Instead, Nortel has used the alleged

$3.9 million "obligation" for leverage purposes in the context of purchase and/or upgrade of additional "products."

41.     In addition to the express license conferred by the Purchase Agreement, FDN alternatively has an implied license to utilize all of Nortel's software that comprises the $3.9 million demand (which for the most part is associated with the residential and business line functionality), for which Nortel has wrongfully sought to impose the "software reconciliation and/or RTU fees", in the amount of $3.9 million, as described on **Exhibit "B"**. To the extent the Nortel Later Software RTU Policy (Exhibit "C") or even the Purchase Agreement (**Exhibit "A"**) provide otherwise, the FDN implied license controls.

42.     Enforcement of Nortel's intellectual property rights are barred by FDN's express and/or implied license to the Nortel software in question, the copyright misuse doctrine, Florida law precluding deceptive and unfair trade practices, and other limitations imposed by law and equity in Florida.

43.     Unless and until this Court rules upon the propriety of Nortel's conduct, particularly whether or not Nortel is in default under the Purchase Agreement by reason of the fact that Nortel is erroneously claiming entitlement a $3.9 million "obligation" of FDN for "software reconciliation and/or RTU fees" to which Nortel is not entitled under the Purchase Agreement, then FDN must govern its business affairs with an extortionate back-billed claim of $3.9 million as a potential liability which FDN could be faced with at Nortel's mere whim, should Nortel ever decide to invoice FDN therefore. Nortel also has a pattern and practice of threatening copyright infringement, trade secret usurpation, and breach of contract actions when smaller telecommunication companies like FDN do not succumb to Nortel's ransom demands. FDN invokes this Court's declaratory powers to preempt such action on Nortel's part, none

having yet been threatened as to FDN (FDN hasn't even yet been invoiced, and no formal demand of any kind has been made upon FDN).

44.    In order to avoid injustice, Nortel has waived, or should be estopped, from asserting that FDN is obligated to pay a portion or all of the approximate $3.9 million "obligation" for "software reconciliation and RTU fees" that Nortel has wrongfully claimed was due and owing from FDN.

45.    For the reasons set forth, FDN now seeks a declaration that:

a.    Nortel is in breach of the Purchase Agreement, and has engaged in improper sales, billing and business practices (including copyright misuse and deceptive and unfair trade practices), by virtue of the matters and circumstances described herein;

b.    FDN has an express license conferred under Section 10.2 and other operative provisions of the Purchase Agreement, and/or alternatively has in implied license conferred by operation of law, to utilize the software to which the "software reconciliation and/or RTU fees" relate for the duration of the life of the Hardware as it may be repaired or modified, so FDN is not obligated to pay Nortel therefore;

c.    The amount claimed in Nortel's "Network Evolution Proposal" sales presentation materials delivered March 15, 2006 (Exhibits "B" hereto) - approximately $3.9 million (or any portion thereof)- is not "due and payable" under the Purchase Agreement by FDN to Nortel, and FDN is therefore not in default on its contractual obligations to Nortel.  To the extent any particular line-item portion of this sum is found to be due from FDN to Nortel, notwithstanding the express and/or implied license FDN has and the legal and equitable grounds for objection thereto that FDN has raised, FDN

seeks a judicial determination of the amount thereof, and the application any and all appropriate set-offs;

        d.      Nortel cannot terminate, disconnect, impound or recover any services or products in any way related to FDN's switches as a consequence of FDN's nonpayment of the $3.9 million "obligation", should Nortel elect to declare that same to be due and owing by FDN, until this Court has determined the propriety of Nortel's conduct herein, FDN's contention being that Nortel's actions are in violation of the terms and provisions of the Purchase Agreement and governing law; and

        e.      Such other and further equitable and supplemental relief as this Court deems just and proper, including coercive relief in the nature of a mandatory injunction that Nortel comply with its obligation under the Purchase Agreement and governing law, consistent with Florida Statute § 86.061, 86.111, and other governing law.

## COUNT II - BREACH OF CONTRACT

46.     FDN realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 35 above.

47.     The Purchase Agreement governs the rights and obligations of FDN and Nortel with respect to the provision of telecommunication products and services by Nortel to FDN, and the resolution of disputes concerning amounts owed between the parties.

48.     FDN has materially complied with all of its obligations under the Purchase Agreement.

49.     Nortel has materially breached the Purchase Agreement, and/or has anticipatorily repudiated its obligations under the Purchase Agreement, by virtue of the acts and omissions more particularly described herein,  including, but not limited to, Nortel's extortionate

threatening to make a back-billing demand for payment of a purported $3.9 million "obligation" for "software reconciliation and/or RTU fees" that is not due and owing by FDN.

50. Nortel's conduct as described above is in breach of the implied duty of good faith made applicable to the parties and the Purchase Agreement pursuant to the Florida Uniform Commercial Code and other governing law.

51. Nortel's breaches of the Purchase Agreement and breach of implied duty of good faith and fair dealing as aforesaid, have caused FDN to suffer substantial direct damages in an amount to be determined at trial.

52. FDN prays for specific performance of FDN's rights under the Purchase Agreement, as against Nortel, for the reasons set forth herein.

53. FDN prays for recovery of all damages proximately caused by the breaches of contract by Nortel described hereinabove, including but not limited to lost profits, and further moves for recovery of FDN's attorneys' fees and costs incurred in litigating under Purchase Agreement, together with such other and further relief as this Court deems just and proper.

## COUNT III - FRAUDULENT OR NEGLIGENT MISREPRESENTATION IN THE INDUCEMENT

54. FDN realleges and incorporates by reference the allegations contained in Paragraphs 1 through 35 above.

55. Both before and after entering into the Purchase Agreement, Nortel falsely or negligently misrepresented that it would bill FDN in accordance with the terms and provisions set forth in the Purchase Agreement.

56. Nortel also periodically made representations to FDN, over the course of the contractual relationship, as to the indebtedness status of FDN's account, Nortel having had, and exercised, remote access capabilities to audit FDN's switch utilization levels for the past seven

(7) years prior to making such representations. At no time did these representations as to FDN's statement of account include the $3.9 million "obligation" consisting of "software reconciliation and/or RTU fees" to which this lawsuit relates.

57.     Nortel conducted its course of dealings with FDN, both prior to and after entry of the Purchase Agreement, as if FDN had an express and/or implied license, conferred by the Purchase Agreement or governing law, to the software that now makes up Nortel's "software reconciliation and/or RTU fees" described elsewhere herein.  FDN's recent discovery of the Later Nortel Software RTU Policy, coupled with Nortel's wrongful inclusion of the $3.9 "obligation" in new and/or upgraded product sale negotiations, support the premise that Nortel never intended to abide by its promises and representations as aforesaid, but used them to induce FDN to act accordingly.

58.     Nortel made the foregoing false statements for the purpose of inducing FDN to act in reliance thereon.  Nortel intended for FDN to take the steps which FDN did take in this matter.

59.     Since January 2006, Nortel has engaged in a pattern and practice of systematically and materially manipulating its billing under the Purchase Agreement with the intention of gaining a strategic advantage over Nortel's competitors with regard to FDN's potential purchase or upgrade of additional product and services from Nortel.  Nortel has engaged in such practices intentionally or negligently with knowledge that such extortionate back billing obligation was false, or with reckless disregard and abandon to the consequences to FDN, or to the accuracy of Nortel's statements and practices.  To the extent the facts and circumstances are found by the finder of fact to not constitute outright fraud, then at a minimum, Nortel failed to exercise

reasonable care in obtaining or communicating correct information to FDN concerning the complained of circumstances, and acted recklessly.

60.     FDN relied to its detriment upon Nortel's intentional or negligent misrepresentations as aforesaid.

61.     As a result of Nortel's negligent or intentional misrepresentation, including its fraudulent billing sales solicitation practices, FDN has suffered damages in an amount to be determined at trial.   Such damages include but are not limited to FDN being hindered in its ability to make the best available product purchase and upgrade decisions, as well as damage to FDN's ability to operate and conduct its business.   FDN has also incurred expenses and fees in responding to Nortel's improper billing and sales solicitation practices, as well as injury to FDN's business reputation.

62.     FDN reserves the right to subsequently plead for the recovery of punitive damages after the proffer and hearing required in Florida Statutes § 768.72 has been made.

### COUNT IV - DECEPTIVE AND UNFAIR TRADE PRACTICES

63.     FDN realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 35 above.

64.     This is a cause of action for damages and declaratory and injunctive relief arising out of violations of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") codified in Section 501.201-213 Florida Statutes.   FDUTPA was amended in 1993 to apply to "... unconscionable acts or practices, and unfair and deceptive practices in the conduct of any trade or commerce," "trade or commerce" being defined to include the "soliciting, providing, offering or distributing, whether by sale, rental or otherwise, of any good or service, or any property, whether tangible or intangible... wherever situated.   See, F.S. § 501.214 and 501.203(8).

65.     As more fully described herein, Nortel engaged in unconscionable, unfair and deceptive acts and practices in the conduct of its business with respect to FDN. FDN is protected by FDUTPA because Nortel is a provider of services to FDN. The actions which Nortel has taken *vis-à-vis* FDN, complained of elsewhere herein, are in derogation of FDN's rights under the Purchase Agreement and the express and/or implied license conferred upon FDN. Nortel's actions also constitute copyright misuse under Federal law, are consistent with a pattern and practice of conduct on Nortel's part that is violative of Florida law, and are in derogation of FDN express and/or implied license.

66.     Nortel's unconscionable, unfair and deceptive acts and practices have directly and proximately caused FDN to suffer a loss and FDN has been damaged as a result thereof. In addition to the recovery of all individual remedies available under F.S. § 501.211 and other governing law, FDN prays for declaratory judgment and injunction that Nortel has violated, is violating, and is otherwise likely to violate, FDUTPA by the conduct complained of herein. The wrongful conduct includes, but is not limited to, copyright misuse, wrongful linkage or tying of Nortel's product sale solicitation with the an extortionate $3.9 million "obligation" for "software reconciliation and/or RTU fees" (which Nortel threatened would ripen into a demand if FDN did not make the requisite amount of purchases from Nortel that Nortel required), and other actions in flagrant disregard to FDN's express and implied license.

67.     In addition to declaratory, injunctive, and such other and further supplemental relief as this Court deems proper, FDN prays for entry of an award of damages, together with attorneys' fees and costs, in an amount to be determined at trial.

## JURY TRIAL DEMAND

68.     FDN demands a jury trial on all matters described above as so triable.


Dated this ___30th___ day of May, 2006.

                                        T. TODD PITTENGER
                                        Florida Bar No. 0768936
                                        Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
                                        215 North Eola Drive
                                        Orlando, Florida 32801
                                        Telephone:  407-843-4600
                                        Facsimile:  407-843-4444
                                        Attorneys for Plaintiff

0061014/122260/954424/1                          26